Good morning, ladies and gentlemen. Our first case for argument today is United States v. Matthews. Mr. Kelleher. Good morning, Your Honors. Christopher Kelleher for Monty Brannan. Mr. Brannan has raised seven issues on appeal. The leading four concern sufficiency of the evidence. That leads to my first question, Mr. Kelleher, which is where can we find the district court's ruling on the sufficiency of the evidence? Your Honor, there was no published, written opinion. There were at least two. Some of them were cited by the government's brief, although the government did not attach them. The district court spent the first 20 pages of the sentencing transcript discussing this issue. Our Rule 30 requires that to be attached as an appendix to your brief. You have certified to this court that you complied with that rule. You transparently did not. We found seven rulings of the district court that are attacked here, not a single one of which is in the appendix to your brief. How did that happen? Your Honor, I apologize to the court. Making a false certificate to a court is more than a matter of apology, counsel. Don't misrepresent things to a court. Yes, Your Honor. And I would say that it was a misstep on my part because there was no written, published opinion. Our rule is crystal clear. It was amended more than 20 years ago to make it clear that the requirement includes discussions in transcript. It's not limited to published opinions. Is there some ambiguity in the rule that confused you? No, Your Honor. Then why are you saying, well, there's no published opinion? Your rule is crystal clear. Yes, Your Honor. And again, I made the mistake and we should have. Myself, my co-counsel, I take full responsibility for not including the transcripts. Please proceed. Thank you, Your Honor. As to the sufficiency of the evidence, the evidence demonstrated that Mr. Brannon was essentially a silent partner. Mr. Matthews was the puppet master. He pulled the strings and any authority that Mr. Brannon might have had was simply nominal. What about this loud discussion that resulted in the $7,500 check to Brannon afterwards? Certainly, Judge Brannon, that could be construed as demonstrating Mr. Brannon knew something was up. But we would have to essentially speculate as to what transpired in that conversation. Obviously, there was no testimony from either defendant or a third party or third witness as to what transpired in that discussion. But admittedly, the timing does look a bit suspect. I would concede that point. Additionally, when you look at the timing and the context here is critical, Mr. Brannon did not come into the picture until essentially three years later after other investors had been involved after the project had started. So in essence, we would assert Mr. Brannon was to some degree a victim as well. Three years into the project, it was already having problems. Mr. Matthews was already having financial issues. And essentially, Mr. Brannon was a lifeline. His million-dollar investment in July of 2011 was a lifeline to this project. So Mr. Brannon, in a lot of ways, again, not to dismiss some of his involvement, but in a lot of ways, he was a victim as well. Well, he entered the scene, at least as I can figure it out, and call it about July of 2011. Does that seem fair? Yes, that's correct. That's when he invested in GEM, as everyone's calling it? Yes. Okay. But the activity for which he was found criminally responsible really, it's like 2016, 2017. So he's part of a business enterprise with Mr. Matthews for about four or five years, including sharing office space, attending meetings where checks are signed, and the like. So I thought you might make the timing argument, but there's a lot of time that passed. Certainly, Your Honor. And Judge Scutter, we recognize that there was a substantial amount of time between 2011 and 2016. But, again, I think the plan was set in motion prior to that, prior to Mr. Brannon coming on. And that's what I think makes this case a little bit different, a little more unique than some of these typical cases because, again, Mr. Matthews had set his plan in motion. He was already treading water. He was already shifting funds around, needing money. And, therefore, Mr. Brannon coming in, when he did, again, he was a lifeline. But also, Mr. Matthews essentially didn't change his modus operandi. He was continuing to shift funds, continuing to lure investors, continuing to keep- But after that meeting that Judge Brennan referred to where there were raised voices or table-pounding or whatever happened there, Mr. Brannon started to receive checks, right? Checks that were sent to his enterprise, Brannon & Company, diverted away from the creditors at that point in time. Or at least couldn't a reasonable jury have so construed the evidence? They could, Your Honor, on some of these checks. But, again, I would point to the context overall on some of at least the mailings, let's say, to lenders on some of these counts. Again, that Mr. Brannon, his impact was, I would say, was non-existent. Because, again, Mr. Matthews was continuing his trend of misleading or at least keeping lenders and investors in the dark. I see a minute of my rebuttal if there's no further questions. Thank you, Your Honor. Thank you, Counsel. Mr. Breedlove. Mr. Breedlove, I have the same question for you. Where do we find the district court's rulings in the appendix to your brief? You do not, Your Honor. I failed in my obligations to the court and I failed in my certification. That much is clear from the previous question. Well, it's not a question of failing. It's a question of lying. If you lie to a federal court, there are consequences. Understood, Your Honor. Did you even read Rule 30? I did, Your Honor. Then how can such a thing happen? One of the pieces of Rule 30 is, and I quote, if the appellant's brief challenges any oral ruling, the portion of the transcript containing the judge's rationale for that ruling must be included in the appendix. And you certified that you had done that. That's correct, Your Honor. Well, there have to be consequences. Understood, Your Honor. The government, in its closing argument, Your Honors, refers to the case as something that reads like a book, and they refer to all the sections of the book. In their indictment, the largest section of their book, covering nine paragraphs, is about the side letter agreement. The side letter agreement is referenced during the trial over 275 times. By my count, it's about 283. The court refers to it as one of the most important theories of the government's case. Despite all of that, the court's ruling, preventing us from putting on information about whether or not the side letter agreement was valid, leaves the jury reading a Cliff Notes version of the book. They don't have the full story. Our justice system, the foundation of it, the foundation of the jury, is ensuring they get the correct instructions and all of the evidence. Mr. Breedlove, give me 30 seconds on the story of the side letter agreement. I know what it is, and I know why, or I think I know from the briefing why it was executed or why the city wanted it. What I can't understand from the briefs is how it connects to a theory of defense. It connects to a theory of defense in two ways, really, Your Honor. The first is that it's central to the government's argument. They reference it so frequently, and they try to conflate throughout the trial. Just go to this content of it. I know it's talked about a lot, but there's not a lot of context given as to why Mr. Matthews thinks it's somehow exonerating. That's what I don't understand. How does he think that the side letter agreement exonerates him from these fraud convictions? Part of the alleged fraud was breaching that contract, Your Honor. Diverting money away from creditors. But part of the evidence was also that they were signing false certificates and those sorts of things related to the side letter, and that was a lot of the evidence and that they weren't allowed to do those things as a result of the side letter. And so the rules of the game that the jury were told were that one of the rules they have to follow is the side letter. And they were being told, in evidence that didn't come in because it ended up being barred, by attorneys that it may not be valid. They had bankruptcy trustees that thought they had claims against the city. And so when we have this contract that is such a central tenet of the government's case, it's the most important chapter of their book, and we don't allow the defense to talk about why it might not be valid. That's what... Why the side letter might not be a valid agreement? That's correct, Your Honor. And if it's not a valid agreement, the mens rea and what the jury would interpret from the breach of it is going to be potentially different. Okay. I've got another question for you. There's some references in the brief. I had a hard time connecting the dots here. There was either a lawsuit filed by your client, maybe Mr. Kelleher's client, too, or a lawsuit threatened against the city of Peoria. You know what I'm talking about? I do, Your Honor. Okay. And there's arguments in the brief about how... Or contentions that the district court committed error by not admitting into evidence the complaint or a draft complaint or something? That's correct. What's going on with that? There were lawsuits against the city. It was a very litigious in civil court situation. And one of the... But what is the alleged error, that the U.S. district judge should have admitted into evidence just a civil complaint? Is that... What's being challenged on appeal involving this complaint? That the complaint and all of the circumstances around it should have been allowed in. Again, it's one of the chapters of the government's book, is the civil lawsuit. And in the indictment, the government complains that part of their scheme to defraud was continuing things out by filing for substitutions. But what I don't understand about that is how does the existence of a civil complaint go to whether the government proved the elements of mail fraud beyond a reasonable doubt? It just seems like, all right, there's civil litigation going on alongside criminal. It happens all the time. Certainly. But it provides the context for what the defendants were thinking throughout all of this. It provides context for whether... I mean, it provides context for... Just admitting the complaint is not going to provide... I mean, the defendants could have chose. They didn't have to, obviously. But they could have chose to testify. They obviously have an absolute right not to. That's correct. We tried to get that evidence in and discuss the lawsuit, everything that went around it, the advice from their attorneys, that it was the attorneys driving the multiple substitutions of judges. Because the government, during the trial and in the indictment, alleges that this delay that the litigation caused was part of the scheme to defraud. And so when they're claiming that the lawsuit itself and the tactics, the legal tactics that they're taking, that their attorneys are taking, are part of the scheme to defraud and we're not allowed to defend ourselves and talk about the lawsuit, talk about the reasonings behind what they were doing, that it was the attorneys that were making these decisions on substituting judges in the trial court, then they're only getting to put on their part of that chapter. So again, it's not necessarily that admitting that document means they're exonerated. It's not. It means that it prevented us from putting on a full case and giving the jury the full information. And the government's the master of their indictment. They complained during the trial that this would create a mini-trial on the contractual documents and on the lawsuit. If that was their complaint, they could have amended the indictment and removed those two sections, and then that would have been a much different story about what we believe we should have been able to put on. If there are no further questions. Thank you. Okay. Ms. Boyle. Good morning, Your Honors. May it please the Court, Counsel, my name is Catherine Boyle on behalf of the United States. Judge Easterbrook, I'd like to start off by apologizing. I did not notice that the rulings weren't in the defendant's appendix, and had we noticed, the government would have provided them. Well, the rules do not require the appellee to include that information. We certainly appreciate it when appellees do. We generally do. We had to spend a lot of time rooting about in the record to find things that the lawyers have to know are there and where they are. The government generally attempts to provide those documents as a courtesy if we notice they're missing from the defense brief, and we would have done so had we noticed. It's hard not to notice when there is absolutely nothing of the district court's explanation attached to a brief. Yes, Your Honor. Please proceed. Your Honor, we are here today because the defendants Gary Matthews and Monty Brannan raise a host of claims in an effort to escape responsibility for their part in a years-long scheme to defraud investors and lenders associated with the Paramarket Project in Peoria, Illinois. I'd like to look at the sufficiency of the evidence arguments first. Turning first to mail fraud, Mr. Matthews, by adopting the arguments in Mr. Brannan's brief, has waived any claims as to mail fraud. Mr. Brannan's brief entirely throws Mr. Matthews under the bus, essentially, in terms of the fraud scheme. Additionally, the evidence was more than sufficient as to Mr. Brannan himself. On that front, Ms. Boyle, I'm speaking to Brannan becoming purchasing interest in GEM. Yes. I have a question about that. What evidence is there that Brannan knew that the periodic updates were sent to investors? Was that part of the GEM operating agreement? It's obviously a very complex record. Do you have any information on that? Yes. Mr. Brannan first joined GEM in July 2011, and once he joined, he shortly thereafter became a co-manager. In his role as co-manager, he would go over these profit and loss statements at monthly meetings, which Mr. Matthews attended also. So he's aware that these are coming in. He knows what they say. We also believe through his role as co-manager, although we don't have anybody directly saying Mr. Brannan saw these mailed out, I think the jury could easily infer that he was aware that this was happening. Mr. Brannan was at the GEM office three to five days a week. The office was moved to the Paramarket Hotel. He was very closely involved in everything that was happening and going over these particular statements as well, Your Honor. So the inferences would be that the jury could conclude would be from his role with GEM, how often he was in the meetings. Was there any evidence? It was an 11-day trial, obviously a long record. Is there any evidence in there about Brannan speaking to the periodic updates sent to investors? Well, he attended the monthly meetings with FHG where they talked about them, and we believe throughout the trial, and I can go back, Your Honor, and file a supplement or if it's helpful, we believe that there was evidence that Mr. Brannan knew that mailings were going out to the investors on a regular basis. I had a similar question. Is that – Brannan invested in July of 2011, as you just said. Is there any evidence that he himself was a recipient of the mailings as an investor before he became more actively involved? I don't know. Because he takes on an equity position in GEM. That didn't come out during the trial, Your Honor, but I also want to say here as well, there's no evidence that presented at trial that Mr. Brannan also got these updates, although I can check on that as well. Something I think that goes also to Judge Brannan's question and may be helpful in yours as well is because Mr. Brannan here under the case law was part of the scheme to defraud, he had the intent to defraud, these mailings were reasonably foreseeable as updates to investors. You also don't need to as closely prove that he knew that a specific mailing went out and what it contained, and that's clear under cases such as Dooley, Turner, McQueen. All these cases show that if it's a reasonably foreseeable mailing in the course of the scheme, that it can be attributable to Mr. Brannan as well. He doesn't have to directly do it. He doesn't have to directly be involved. Do you know when he invested? Did he invest pursuant to a subscription agreement that had terms and conditions requiring periodic mailings? I don't believe he invested pursuant to a subscription agreement. The subscription agreements were for the original investors who basically were told that their funds would go into escrow, and depending on when you signed on, you'd get 2% or 4% in terms of ownership of Jim. And Mr. Brannan came in and essentially just did a split with Mr. Matthews on the remaining 10%. So this is a different agreement. If the side letter agreement didn't exist, were the defendants allowed to take management fees? Absolutely not, and I think that's one of the things that was really glossed over when defense counsel was speaking up here earlier. There's a 2012 contract with Indoor that says they are not allowed to take fees once construction is over unless certain requirements are met, and none of these requirements were ever met. There was a reserve account that was supposed to be at a certain amount. The hotel had to be a certain amount profitable, various requirements that weren't met. The defendants were not allowed to take fees regardless. If anything, the side letter amendment is something of a clarification, and really I think it was just the city of Peoria looking for some security and transparency as to this $7 million loan, which was their employee's pension fund. This was not an effort to touch on some of the arguments in the defendant's brief of the city of Peoria to somehow force a contract under duress. This is really the city looking to protect its employees. There's two parties to a contract. There's going to be a modification to the contract. It's evident that initially Mr. Matthews wanted EM Properties to manage the hotel despite not having direct experience in that kind of thing. He then gets FHG in, and as we all know, Joe Lomonaco is basically Mr. Matthews' guy, so he's going to have a substantial amount of control. And I think the city of Peoria was somewhat receptive to the idea that perhaps the hotels could be more profitable. I'm sure they were concerned about the profit level so far if Marriott were removed and they had sort of a more Illinois-based company that might know the market a little bit better in their opinion. But they were also worried because this is something that's giving Mr. Matthews and Mr. Brannon increased control. Under Marriott, the defendants couldn't see the bank accounts for the hotel, the hotel's operating accounts. That changes with FHG. So really the side letter amendment was the city being cautious, and it turns out the city correctly forecasts some potential fraud and problems in this case. So that's a long answer to your question of did anything else prohibit it. There was nothing that prohibited the defendants from calling witnesses from the city that had full awareness of the side letter agreement and its terms and conditions, right? Now that I'm aware of, Your Honor. I mean, they may not have done that, but they could have. They could have subpoenaed all kinds of witnesses that probably had awareness of what was going on with that agreement. Absolutely, Your Honor. Turning to Counts 3 through 5 for the mail fraud, we talked a little bit about the scheme to defraud, which, of course, began with Mr. Matthews. He started soliciting investors before the deal was even inked with the city in 2008, and immediately there's a lot of irregularities here. He goes in. He solicits investors. The funds don't go all to the escrow accounts that they're supposed to. He's only supposed to take $500 a month. He takes a million-dollar fee that he wasn't supposed to take. And then, again, in 2015, Mr. Brannan's involvement becomes clear. Mr. Brannan has the loud argument with Mr. Matthews in the gym offices, which is witnessed by Carly Johnson. He goes behind closed doors. And then all of a sudden he comes out, and what does Mr. Brannan get but a $7,500 check from the PMH LLC account. And then these checks keep coming. And then he becomes a signatory. He becomes a co-signatory shortly after that. He submits a third certificate of compliance, which clearly makes false statements about what's going on with management fees. So this is when Mr. Brannan becomes really involved, and you can tell Mr. Brannan is an enthusiastic participant in the scheme. It really was actually a turning point in the case. You know, in March 2015, Mr. Brannan could have gone in there and said, you're taking money. This is terrible. I have to tell the investors. I have to tell law enforcement. And, of course, none of that happened. All that happens is checks start getting issued to Mr. Brannan as well. At some point the compliance certificates seem to end. Is it the lender's responsibility to go back and say, hey, we're not getting compliance certificates like we used to? Whose responsibility is that? Well, I think it's Mr. Matthews and Mr. Brannan's responsibility to send in the certificates of compliance. They said they would. It's pursuant to the terms of the side letter agreement. And they did for a while. They did for a little bit, but not for very long. The fact that should the lenders have followed up, it probably would have been a good idea, but I don't think it invalidates the requirement for Mr. Matthews and Mr. Brannan to do it. And, frankly, given what Mr. Matthews and Mr. Brannan were doing, had the lenders followed up, I think they just would have continued to get false certificates of compliance. I don't know that they would have gotten any more helpful information as to the criminal activity going on. So, yes, and there's also evidence of Mr. Brannan's involvement. Multiple witnesses testified that Mr. Brannan was very aware, it seemed, when these checks were coming over from FHD to the PMH LLC account. He would always show up for what they called Rent Check Day. And he was there to get his cut after he discovered Mr. Matthews' criminal conduct. So for all these reasons, we think Mr. Brannan is clearly implicated in mail fraud on Counts 1 and 2 with regard to the investor mailings, and then again on Counts 3 through 5 with the checks that were sent from FHD to the Paramarket Hotel LLC account. When we look at the money laundering counts, starting first with Counts 7 through 15, the defendants knowingly conducted financial transactions. This seems fairly clear. Both defendants are co-signatories on these accounts, on the PMH account. So any check going from PMH LLC to either EM Properties or to Brannan & Co. is going to be signed by both defendants. They're both helping affect these financial transactions. Defendants don't challenge that some of the money involved in the financial transaction was the proceeds of mail or wire fraud. The evidence presented at trial was more than sufficient to show that they knew the property involved in the financial transactions represented the proceeds of unlawful activity. This is particularly interesting. You have the defendants directing. There's sort of a double deception here. On the first hand, they're directing FHD to classify these payments as rent. But following that, they're instructing Carly Johnson to write in the memo line things like construction management, project fees. And this is, again, just to make this all look a little bit more legitimate. It doesn't look like quite so much of a payout. And then the fourth element, the defendants knew that the financial transaction was designed in whole or in part to conceal or disguise the proceeds of mail or wire fraud. And that's clear as well. In cases like Jarrett, the court has explained that actions like structuring transactions to avoid attention, depositing illegal proceeds in a bank account of a legitimate business can show the intent to conceal the legal nature of the funds. Again, they strove initially to hide the source of the ill-gotten gains by having them classified as rent. Then they have the checks issued and try to make them look like they go to legitimate business accounts. And a rational jury would be able to look at this situation and conclude concealment occurred on these facts. I think it's also particularly interesting in this instance that Count 7 was a situation where there was a check written from Brannon and Co. to Brannon himself. And in terms of the care the jury was taking with this case, there was actually a split verdict on Count 7, which I think really shows that they were parsing the facts here. They were looking at it. And it's certainly possible Mr. Matthews had known about that check, but the jury looked at it and thought, no, that's not quite enough for us. So I think that shows that they were being very careful as they evaluated all of these counts. Mr. Matthews has, again, waived money laundering sufficiency claims as to Count 16 through 18. Mr. Brannon's brief, just like with the earlier mail fraud counts, fully blames Mr. Matthews for these transactions and says that these were all his machinations, that Mr. Brannon was sort of an unwitting bystander to this criminal fraud. Of course, that's not true either. As far as the elements, the parties stipulated that the transactions occurred in remonitory transactions, but sufficient evidence supported that the defendants engaged or attempted to engage in them. As we talked about earlier, they're both required to sign off on transactions that go from the PMH LLC account to the EM Properties account. Additionally, and importantly here, this was charged in an aiding and abetting manner. So because a defendant may be found to aid and abet a Section 1957 violation, he may be found to aid and abet it when he adds a signature, when two signatures are required to negotiate. And Mr. Brannon also cannot claim responsibility because he did not have control over the transactions. He sort of evades the fact that the relevant transaction here is from the Paramarkat Hotel to EM Properties. Mr. Brannon is alleging he didn't have control over the FHG to the Paramarkat Hotel account, sort of the landlord account that Matthews and Brannon control. But that is, first of all, not what we need to look at here. That's not the specific transaction we're looking at for this actual money laundering. But second of all, as we discussed earlier, we think Mr. Brannon had plenty of control over everything that was going on here. He was in this office up to five days a week and was heavily involved in the fraud and in the day-to-day business operations. Thank you for the flowcharts in your brief. They were helpful. Thank you, Your Honor. I hope so. If Your Honors have no further questions, we'll rest on the arguments in our brief and pass it to the court of arms. Thank you, Counsel. Anything further? Mr. Kelleher? Briefly, Your Honor. I just wanted to reiterate the nominal role that Mr. Brannon played, and especially the fact that JEM and EM properties, along with this other complex web of corporate entities, all predated Mr. Brannon's involvement. He had no participation with the creation of those entities. And, again, it shows that Mr. Brannon came in essentially at an inopportune time, invested in a project that he thought would be profitable. He was misled, just like everyone else. So I would just ask the court to consider that context. And then, finally, as far as the appendix goes, there was no intent by myself or my co-counsel to mislead. I dropped the ball, and I've been doing this for over 20 years, and this is the first time that's ever happened, so I profusely apologize to the court. If there are no further questions, I have nothing further. The case is taken under advisement. Thank you.